Filed 9/28/20  B.W. v. Superior Court CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| B.W. et al., <br><br>    Petitioners, <br><br>        v. <br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, <br><br>    Respondent; <br><br>SAN FRANCISCO HUMAN SERVICES AGENCY et al., <br><br>    Real Parties in Interest. | A160436 <br><br>(San Francisco City & County Super. Ct. No. JD183161) |

This writ arises from dependency proceedings involving J.T., a boy born in 2015.  At the jurisdiction/disposition hearing, J.T.'s father, E.T. (Father), who was incarcerated, waived reunification services.  At a subsequent review hearing, the juvenile court terminated reunification services to J.T.'s mother, B.W. (Mother), and set a selection and implementation hearing under Welfare and Institutions Code section 366.26.[1]  Father filed a petition for extraordinary writ relief, contending his court-appointed counsel provided

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

ineffective assistance when she advised him to waive reunification services at disposition.[2]  We deny the petition.

## I.  BACKGROUND

### A. *The Petition and Detention*

On July 17, 2018, the San Francisco Human Services Agency (the Agency) filed a dependency petition on behalf of three-year-old J.T., as well as a detention report.  The petition and report stated that, on July 13, 2018, while at the beach and in front of several witnesses, Mother took J.T. into the San Francisco Bay, out to a depth of about three feet, set him down, and walked away.  J.T. was wearing jeans, shoes, a sweater, and a heavy coat. He was able to walk out of the water onto the beach, but he was cold, wet, and crying.  Police arrived, and J.T. was taken first to the hospital, and then into protective custody.  Mother was arrested.

The detention report stated Father was incarcerated in San Bruno County Jail and had been incarcerated since June 2014 (before J.T.'s birth). Father stated he had regular visits with J.T. at the jail.

At the detention hearing on July 18, 2018, the court appointed counsel for both parents, appointing Amanda Inocencio as counsel for Father (who was then listed as J.T.'s alleged father).  The court ordered J.T. detained in foster care.  Supervised visits were ordered for Mother, and the Agency had discretion to arrange supervised visitation for Father.

---

[2] Mother filed a notice of intent to file a writ petition, but Mother's counsel then filed a petition raising no issues.  In a declaration accompanying the petition, counsel states she informed Mother that counsel did not find any arguable issues.  Mother did not file a petition or brief.  Since neither Mother nor her counsel has raised any issues, we now dismiss Mother's petition.

In August 2018, Father filed a statement of parentage, stating he had signed a voluntary declaration of paternity shortly after J.T.'s birth. Also in August 2018, the court elevated Father's status to presumed parent.

**B.** *Jurisdiction and Disposition; Father's Waiver of Services*

In a report filed in August 2018 for the jurisdiction/disposition hearing, the Agency reported Father was still incarcerated and was expected to be released in one to two years. Father had been incarcerated since Mother was pregnant, so he had not lived with J.T., but he had visited with him when family members brought J.T. to the jail, and was now having one-on-one visits through the One Family program. Mother had significant mental health difficulties, had attempted suicide shortly after the incident that led to J.T.'s detention, and had been placed in a psychiatric hospital with plans to transition to a locked residential facility. As to Father, the Agency, citing section 361.5, subdivision (e), recommended not offering reunification services due to the anticipated length of his incarceration. The Agency stated, however, that it encouraged visitation between J.T. and Father, and would support visitation through the One Family program.

In a September 2018 addendum report, the Agency stated Father had been transferred to San Francisco County Jail. Mother had been transferred from the psychiatric hospital to a mental health rehabilitation center. J.T. had been placed with a family friend in August 2018. Father and his attorney in the criminal case believed he might be able to bargain for a release date as early as October 2018, and that there was a 50 percent chance that would occur. As to services, the Agency stated: "If he is released, [Father] will be entering a halfway house where he will receive case management services to help him transition back into the community. If he is released and choose[s] to participate in reunification services, those services are outlined below. However, he may choose to waive reunification

3

services at this time. In this case, we would recommend that he continue to have supervised visitation with his son. If he is incarcerated beyond the statutory time limits for services, the agency would revert to the original recommendation to bypass him for services under [section 361.5, subdivision (e)]."

At the jurisdiction/disposition hearing on September 26, 2018, Father appeared over the phone, and his attorney, Ms. Inocencio, was present. The parties had reached an agreement on jurisdiction and disposition. The initial dependency petition filed in July was amended by interlineation, and the Agency filed an amended petition. The amended petition included three counts, all under section 300, subdivision (b), including one count pertaining to Mother's mental illness, one stating J.T. had suffered physical and emotional harm as a result of Mother's actions, and one pertaining to Father, which read: "The father, who is currently incarcerated and has been incarcerated since before the minor was born, has had regular visitation with the minor, and is unable to supervise or protect the minor adequately from the mother, who has a history of mental health issues, placing the minor at risk of physical harm or death."

Both parents waived their trial rights and submitted to the amended petition based on the Agency's reports. Father's attorney, Ms. Inocencio, presented the court with a signed waiver of rights (Judicial Council form JV-190) and a signed waiver of reunification services (Judicial Council form JV-195). Counsel stated she had gone over both forms with Father. Counsel reported that, although a transport request had been made, the Sheriff's Department had determined Father was ineligible to be transported to court for the hearing. Counsel stated that was an error, but it was remedied by working with the Sheriff's Department to make him available by phone.

4

Ms. Inocencio stated she had spoken with Father by phone right before the hearing, and she reported Father would "submit to not being transported today and instead appearing telephonically."

The court then addressed Father and asked him about the two forms. Father confirmed he had signed and initialed the forms, had discussed them with his attorney, and knew what he was doing when he signed them. Based on this colloquy, the court found Father had entered a "knowing, intelligent, free, and voluntary waiver of trial rights" and a "knowing, intelligent, free, and voluntary waiver of services."

On the waiver of reunification services form itself (Judicial Council form JV-195), Father signed at the bottom and initialed boxes next to statements confirming that he understood the types of available services, did not wish to receive services, did not wish to reunify with his child, and understood that if no services were ordered, the court ultimately could terminate parental rights and place the child for adoption. He also initialed a box next to a statement confirming that "I have discussed my rights with my attorney, and I knowingly and intelligently waive these services." Father's attorney, Ms. Inocencio, signed below a paragraph on the form stating that she had explained to Father the nature of reunification services and the statutory time limits applicable to them, and had advised him of his right to services and the potential consequences of waiving them, "including the likelihood that parental rights will be terminated and the child placed for adoption." She stated she was satisfied that Father understood his rights and was voluntarily waiving them.

After the court found Father had voluntarily waived services, Father's counsel, Ms. Inocencio, stated: "And, your Honor, if I could just interject with some information to the Court at this point. [Father] is currently in custody

5

in San Francisco, as you know.  It is anticipated that he may be released somewhere in the near future, and after that date he intends to possibly go into a halfway house.  Currently he's having visitations with [J.T.], and they're going quite well.  It is my understanding that there is an intention by the Agency to continue the visitation between the father and the child. [¶] And in my communications with [Father], it would be his intention, once he's released from custody, whatever time that is in the future, to then request from this Court access to receive services so that he might engage in reunification with his son.  [¶] I have explained to him the information around the limited amount of time that [M]other could engage in reunification services; and at the end of that time, should she not reunify, the Court would have an obligation to either put [J.T.] into one of three settings, one being possible adoption, and [Father] is aware of that timeline and the possibility of that happening.  His request would be that it wouldn't happen because he would like to reunify with his son, but he does understand the potential consequences."  The court replied, "Okay."

The court then made jurisdiction and disposition findings.  The court found true the allegations in the amended petition, declared J.T. a dependent, approved the Agency's placement of him with a non-relative extended family member, and ordered reunification services and therapeutic visitation for Mother.  The court also ordered the continuation of supervised visitation for Father.

## C. *The Six-Month Review Hearing*

At the six-month review hearing on March 28, 2019, the court adopted the Agency's recommendation to continue services for Mother until the 12-month review hearing.

In its report for the six-month review hearing, the Agency reported Mother had been "permanently conserved" in December 2018.  She remained

6

in a locked psychiatric facility. It was possible she would be moved soon to a less restrictive environment. She was participating in therapeutic visitation with J.T.

Father was still incarcerated in San Francisco County Jail. As of the writing of the report, Father had been incarcerated for four years eight months. Father had attended parenting classes and weekly support groups for fathers. He was receiving services through Pathways, which would connect him to the No Violence Alliance (NoVA) when he was no longer incarcerated. NoVA would provide assistance with employment and housing. Father stated he planned to use NoVA's wraparound services upon his release, which could be as early as July 2019.

The Agency was transporting J.T. to jail about every other week for supervised visits with Father. J.T. knew who his father was and enjoyed seeing and interacting with him. Father was nurturing, affectionate, and attentive during the supervised visits. While noting Father had waived services, the Agency stated that if he was released from custody soon, the Agency would evaluate him as a placement option. The Agency encouraged Father to continue the supervised visits with J.T.

J.T. was participating in therapy and sometimes discussed with his foster mother the trauma he endured while in Mother's care. For example, J.T. stated Mother put him in a closet and tied him up and taped his mouth.

The Agency was planning to move J.T. from his current placement with Mother's godmother to the home of a female paternal cousin, who was willing to adopt J.T. if neither Mother nor Father was able to reunify with him. Mother's godmother was not willing or able to provide permanency for J.T. J.T. was having biweekly visits with his cousin, which had moved from supervised to unsupervised. J.T. looked forward to the visits. His cousin was

committed to having both Mother and Father in J.T.'s life even if they did not reunify. The cousin had an adopted son who continued to have relationships with his biological parents.

At the six-month review hearing, Father was not present. His attorney, Ms. Inocencio, stated: "He's in custody. He's not being transferred today. He's not receiving services. He waived at the disposition. However, he is doing voluntary services while he's in custody. Visitation is going well between him and his son." Ms. Inocencio later stated: "[I]t's possibly foreseeable that the father may be released from custody in early summer, in which case I just wanted to kind of give folks a heads up that I may be filing a JV-180 [i.e., a section 388 petition on Judicial Council form JV-180] for services for him to join the case substantively . . . ."

## D. *The 12-Month Review Hearing*

In its report for the 12-month review hearing scheduled for September 19, 2019, the Agency recommended that the court terminate Mother's reunification services and set a selection and implementation hearing under section 366.26. The Agency stated that, although Mother had made some progress in her treatment plan and her visits with J.T., there were still concerns about Mother's mental health and her ability to care for herself and for J.T.

Father remained incarcerated at the county jail in San Francisco and expected to be released soon. Father's probation officer, however, stated Father did not have an expected release date. The Agency continued to transport J.T. to visits at the county jail, which increased from biweekly to weekly, and the visitation reports continued to reflect that Father was attentive and nurturing.

The Agency reported that J.T. had moved to the home of his paternal cousin in May 2019. The concurrent plan for J.T. if reunification failed was

8

adoption by his cousin. Father identified the same cousin as part of his social support system, along with Father's father.

Although J.T. was doing well in his new placement, he was having difficulty processing trauma from his experiences in his prior placement. J.T. stated that his former foster parent, Mother's godmother, had " 'whoop[ed]' " him with her hands. This allegation was substantiated. The paternal cousin also reported in August that, after visits with Mother, J.T. stated Mother had laughed when he told her that his former foster mother spanked him. The paternal cousin stated J.T. is fearful when he is approached too quickly when he has behavior difficulties. Also in August, however, J.T.'s therapeutic visitation clinician reported J.T. was doing well and could transition out of therapy. J.T.'s paternal cousin advocated for continuing his mental health treatment.

At the 12-month review hearing on September 19, 2019, Father appeared by telephone, and his attorney, Ms. Inocencio, was present. Ms. Inocencio stated she had had extensive conversations with Father's criminal attorney and it was expected he would have a sentencing hearing soon and be released with credit for time served. Ms. Inocencio also stated that Father was not opposed to the Agency's recommendation to terminate Mother's services and only asked that he be offered supervised visitation upon his release from custody, a request the court granted. Mother opposed the recommendation to terminate her services, and the matter was continued for a contested hearing.

At the contested hearing on October 21, 2019, the court continued Mother's services to the 18-month review hearing, finding there was a substantial probability J.T. would be returned to Mother's care by then. The

court set the 18-month hearing for January 16, 2020 (i.e., 18 months after J.T.'s removal from parental custody in July 2018).

**E. *The 18-Month Review Hearing***

In a report submitted in December 2019 for the 18-month review hearing set for January 16, 2020, the Agency again recommended that Mother's services be terminated and that a selection and implementation hearing under section 366.26 be set. The Agency stated that, although Mother had made progress in her treatment plan and was compliant with her medication, she needed more time to stabilize and become independent. In addition, J.T. was exhibiting complex symptoms of posttraumatic stress disorder, and he needed the support of a caregiver who was stable and able to address his ongoing needs.

Father was still incarcerated and was having visits with J.T. Father was appropriate during the visits, but J.T. had recently begun having "extreme tantrums" during the visits. Even with the help of the visitation supervisor, Father was unable to get J.T. to stabilize.

During the reporting period, J.T. had engaged in concerning behaviors, including hurting himself, asking his cousin's son to hurt him, and exposing himself at his placement and at school. He had severe tantrums and reported dreams in which someone was trying to kill him. The social worker spoke with J.T.'s new therapist, who stated that J.T.'s caregiver, his paternal cousin, had been very consistent and understanding with J.T., and his behaviors had decreased. The therapist stated J.T. needs stability and structure.

The Agency also consulted with a professor in the UCSF psychiatry department who, based on information she was provided about Mother's diagnoses and J.T.'s symptoms of emotional trauma, opined it would not be safe to return J.T. to Mother's care. She stated J.T.'s symptoms were

indicative of complex posttraumatic stress disorder, which untreated could result in psychosis. She also stated: " 'Given the potential genetic loading for psychosis, it is imperative to protect this child from additional stresses that can trigger chronic mental health difficulties.' "

Mother contested the Agency's recommendation, and the 18-month review hearing was continued from January 16, 2020, to March 10, 2020, and then to April 20, 2020.

On February 20, 2020, the court granted a request for de facto parent status filed by J.T.'s paternal cousin and caregiver, a request that was supported by J.T.'s counsel.

On March 3, 2020, Father's counsel, Ms. Inocencio, filed a motion to withdraw as counsel, stating there had been an irreconcilable breakdown in the attorney-client relationship. Ms. Inocencio stated that Father had filed a complaint with the State Bar about her and had told her that he no longer trusted her. The court granted the motion on March 4, 2020, and appointed attorney Andrew Safont to represent Father.

In an addendum report filed on April 3, 2020, for the April 20 hearing date, the Agency confirmed its recommendation that the court terminate Mother's services and set a section 366.26 hearing. The Agency reported that Father was released from jail on February 7, 2020. He entered a guilty plea to one count of second degree robbery and one count of possession of a firearm. He was sentenced to five years eight months, was given credit for time served, and would be on parole for up to three years.

Father was living in supportive housing through NoVA and could stay there for up to one year. He was working with his case manager to locate his own housing and was working with Legal Aid to be added to his father's lease. Father was employed 20 hours per week and was doing volunteer

11

work with at-risk youth. After the COVID-19 shelter-in-place was imposed, he continued to work remotely. He was also attending weekly substance abuse and recovery groups. His therapist stated that Father had made the best of his time while incarcerated. The therapist was very impressed with Father and described him as organized and attentive.

When Father was released, the Agency referred him for supervised visitation, but the visits did not initially take place due to a conflict with Father's work schedule. Before that issue could be resolved, all of San Francisco County's non-essential services were closed due to COVID-19. Since that time, the Agency has allowed virtual visits, and Father has had weekly video chat calls with J.T. J.T. talks to Father for 15–20 minutes before asking his caregiver if he can get off the phone.

At the hearing on April 20, 2020, the court continued the contested 18-month hearing due to the COVID-19 pandemic, this time to June 26, 2020. Counsel for Mother, J.T., and the Agency appeared at the April 20 hearing by phone. Father's counsel, Mr. Safont, did not appear, nor did Mother or Father, but appearances were waived due to COVID-19.

On April 24, 2020, the Agency filed a section 388 petition to reduce Mother's visitation with J.T. to one therapeutically supervised visit per month. J.T.'s caregiver had reported that, after J.T.'s visits with Mother, J.T. was having increased episodes of screaming, repetitive behaviors, kicking on the floor, tantrums, and self-harming behaviors. J.T.'s therapist stated J.T. was at a critical developmental stage and stressed the importance of mitigating any threats to his mental health. The court granted the request on a temporary basis on April 27, 2020 (pending a hearing), and then granted the section 388 petition after a hearing on May 20, 2020.

On June 16, 2020, in advance of the contested 18-month review hearing, the Agency filed another addendum report, adding a request that Mother's visits be terminated. After the reduction in visitation, J.T. had had fewer "episodes," and he did not ask to see Mother. J.T.'s therapist tried to address visitation with J.T., but J.T. replied that he did not want visitation because Mother tied him up in jump ropes and wrapped him up in blankets. The therapist agreed with the Agency's request to terminate Mother's visitation.

In June 2020, the visitation supervisor for Father reported visits had not occurred due to technical difficulties with the caregiver's phone. Apparently this was resolved because the Agency's report also states the caregiver was supervising calls between Father and J.T., and the caregiver reported the visits were positive.

The report stated J.T. was thriving in his cousin's home and they had a strong bond.

At the contested 18-month review hearing on June 26, 2020, Father was present by phone with his newly assigned attorney, Julia Ten Eyck. Ms. Ten Eyck reported she had recently received the case from the bar association. The court appointed her as Father's counsel. Ms. Ten Eyck had submitted (but not filed) a section 388 petition on the day of the hearing asking that Father be offered six months of reunification services. The court stated it would set a hearing date on the petition after it was filed. The court proceeded with the contested hearing on the request to terminate Mother's services.

At the conclusion of the June 26, 2020 hearing, the court adopted the Agency's recommendations, terminated Mother's reunification services, terminated Mother's visits, and set a section 366.26 hearing for October 21,

13

2020. The court gave the Agency discretion to arrange unsupervised visitation with Father upon 72 hours' notice to all counsel.

## II. DISCUSSION

Father contends his then-counsel, Ms. Inocencio, provided ineffective assistance at the disposition hearing by misstating the consequences of his waiver of services, leaving him with "the mistaken belief that he could waive his reunification services [at] disposition and then seek them again at a later date when he was released from jail." To succeed on this claim, Father must demonstrate his attorney's performance fell below an objective standard of reasonableness and prejudiced him. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 261.) The customary way to raise an ineffective assistance claim in a dependency proceeding is by filing a habeas corpus petition in the juvenile court (*id.* at p. 258), but an ineffective assistance claim "may be effectively raised as part of an appeal in the rare case where the appellate record demonstrates 'there simply could be no satisfactory explanation' for trial counsel's action or inaction." (*In re S.D.* (2002) 99 Cal.App.4th 1068, 1077.)

Father contends that here the record demonstrates "there could be no reasonable strategic reason for [counsel's] choices," because at the disposition hearing counsel "fundamentally misstated the consequences of the applicable law and the waiver she submitted on behalf of" Father. We disagree.

At the disposition hearing in September 2018, after the court accepted Father's waiver of services, Father's counsel stated that Father intended to request reunification services upon his release from custody, and that she had advised him the court could terminate parental rights if Mother did not reunify within the prescribed statutory period. At the six-month review hearing in March 2019, counsel mentioned this point again, stating that it

14

was possible Father would be released in early summer 2019, and that if he was, counsel might file on his behalf a "JV-180" (i.e., a request to change a court order under section 388, using Judicial Council form JV-180) to obtain reunification services.

Father argues that counsel's statements show that she ignored, and misled Father about, how difficult it would be to "revoke" his waiver of services later in the proceedings. The record does not demonstrate that counsel acted unreasonably. At most, counsel's statements suggest she believed that, upon Father's release (if that occurred while the reunification period for Mother was still ongoing), it would be possible to request reunification services for Father, a request that she later suggested would be made by filing a section 388 petition.

Counsel's understanding that such a request could be made in the future was correct. Under section 388, a parent alleging a change of circumstances may petition the juvenile court to "change, modify, or set aside *any order* of court previously made" (§ 388, subd. (a)(1), italics added), including a prior order directing that the parent not receive reunification services (see *In re G.B.* (2014) 227 Cal.App.4th 1147, 1151, 1153–1154, 1157–1158).[3] And a juvenile court may in some circumstances order services even if a statutory ground for denying them—such as a parent's waiver of services under section 361.5, subdivision (b)(14)—exists. (§ 361.5, subds. (b) [reunification services "need not be provided" when a listed ground for bypass exists], (c)(2) [when a listed ground for bypass exists, court "shall not order

---

[3] As discussed above, Father apparently has filed such a petition. At the June 26, 2020 hearing at which the court terminated Mother's services, Father's current counsel, Ms. Ten Eyck, had submitted but not yet filed a section 388 petition ("a JV-180") asking that services be provided to Father.

reunification . . . *unless* the court finds, by clear and convincing evidence, that reunification is in the best interest of the child"], italics added.)

*Cynthia C. v. Superior Court* (1999) 72 Cal.App.4th 1196, cited by Father, does not hold that a waiver of services forecloses a later section 388 petition to receive services. In *Cynthia C.*, the appellate court held the juvenile court did not abuse its discretion by denying a parent's request to withdraw a waiver of services she had entered months earlier under section 361.5, former subdivision (b)(13) (now subdivision (b)(14)). (*Cynthia C., supra,* at pp. 1197, 1200–1201.) The appellate court stated: "There is no provision in the code or the Rules of Court for withdrawal of a waiver. [Citations.] Nor have we found any authority discussing whether a court may or should address a request to withdraw a waiver of reunification services. Surely that would be permissible in appropriate cases where the requirements of the statute were not satisfied or a parent was coerced or misled into waiving her rights. Further, when a parent has an immediate change of heart . . . , relief might be appropriate. [¶] In this case, however, . . . [n]o evidence emerged demonstrating [the parent] was misled, coerced, or confused . . . . To the contrary, all the evidence demonstrated her appreciation of what she was doing and that . . . she simply changed her mind." (*Id.* at pp. 1200–1201.)

Although *Cynthia C.* found relief from a waiver unwarranted under the circumstances, it recognized certain situations may support such relief. We agree, and we conclude it was not unreasonable for Father's counsel to believe that a viable course of action upon Father's release from custody would be to file a section 388 petition alleging changed circumstances and that the provision of services to Father would be in J.T.'s best interests. (§ 388, subds. (a)(1), (d); see § 361.5, subd. (c)(2).) Counsel's statements to the

16

court that she might pursue such a course do not establish ineffective assistance of counsel.[4]

Other circumstances confirm that counsel could have had a reasonable basis for advising Father to waive services at disposition (while planning to seek them later via a section 388 petition depending on Father's release date). First, if Father had not waived services, the court might have denied them under section 361.5, subdivision (e) (governing services to incarcerated parents), an approach the Agency was recommending in the event Father—a parent who had never lived with his young child—was incarcerated beyond the statutory time limit for services. (See § 361.5, subd. (e)(1) [authorizing denial of services to incarcerated parent if services would be detrimental to the child; in determining detriment, court is to consider factors including child's age, degree of parent-child bonding, and length of sentence].)

Second, while in jail, Father was able to participate in some services. The Agency facilitated supervised visitation between J.T. and Father. The visits went well and allowed Father to bond with J.T. Father also participated in programs such as parenting classes and support groups for fathers. By waiving Agency-provided services, Father did not give up the chance to work toward possible reunification with J.T.

Third, we note that, from the outset of the dependency proceeding, it appeared possible that J.T. would be placed with a relative if reunification with Mother and Father did not occur. For example, at the first hearing in

---

[4] It is not clear the Agency would have opposed such a request if Father had been released at an early enough point in Mother's reunification period. As discussed above, in its March 2019 report for the six-month review hearing, the Agency noted Father had waived services but stated that if he were released from custody soon, the Agency would evaluate him as a placement option.

the case (the detention hearing in July 2018), both paternal and maternal relatives attended, and counsel for both parents stated relatives were interested in placement. In particular, Father's counsel, Ms. Inocencio, noted that a paternal cousin who was at the hearing was a licensed foster care provider. The Agency later placed J.T. with that cousin; she wants to adopt J.T.; and Father identified her as a member of his own support system. The cousin told the Agency that she is committed to having both Mother and Father be part of J.T.'s life even if he does not reunify with them. In light of the possibility of a relative placement, Father and his counsel reasonably could believe that waiving participation in an Agency-directed reunification program might not result in Father's losing all contact with his son.

In addition to the decision to waive services at disposition, Father asserts briefly that his then-counsel, Ms. Inocencio, provided ineffective assistance because she did not file a section 388 petition seeking services immediately after his release from custody in February 2020. This undeveloped argument does not establish ineffective assistance on this record. We note Ms. Inocencio may not have had much opportunity, after Father's release, to consider and discuss with him the best course of action. She was relieved as counsel on March 4, 2020, less than a month after Father's release, after filing a motion to withdraw in which she stated there had been an "irreparable breakdown" in the attorney-client relationship.[5] In any event, it is not possible to determine from this record that there could have been no reasonable basis for counsel's decision.

---

[5] As noted above, the court appointed Andrew Safont as counsel for Father at the March 4 hearing, then appointed Father's current counsel, Julia Ten Eyck, in June.

Because we conclude Father has not shown on this record that his counsel's performance was deficient, we need not address whether any failing by counsel was prejudicial. We note, however, that, as discussed above, despite his waiver of Agency-provided services, Father was able to participate in some services while in jail, including consistent visitation with J.T.

## III. DISPOSITION

Father's petition is denied on the merits. (See § 366.26, subd. (l)(1)(C); Cal. Rules of Court, rule 8.452(h).) The request for a stay is denied. Because Mother has not raised any claim of error, her petition is dismissed. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

STREETER, J.

WE CONCUR:

POLLAK, P. J.
TUCHER, J.